Lester & Associates, P.C.
600 Old County Road, Suite 229
Garden City, New York 11530
Tel: (516) 357-9191
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
JOSEPH PICINI, JR. and MICHELE PICINI,           Index No. 11-CV-2393 (JS) (GRB)

Plaintiffs,

**AMENDED COMPLAINT**

-   against -

CHASE HOME FINANCE LLC., and
JPMORGAN CHASE BANK, N.A.,          **JURY TRIAL DEMANDED**

Defendants.
----------------------------------------------------------------------X

     Plaintiffs Joseph Picini, Jr. and Michele Picini (collectively "Plaintiffs"), through

their undersigned attorneys, and pursuant to the February 16, 2012 Order of the Court, as and

for their Amended Complaint allege the following:

### I - INTRODUCTION

    1.    Plaintiffs bring this suit seeking redress for injuries and damages incurred

throughout the course of the Plaintiffs' dealings with Chase Home Finance LLC (hereafter

"Chase Home Finance") and its parent company JPMorgan Chase Bank, N.A. (hereafter

"JPMorgan Chase," collectively "Defendants") to secure a permanent mortgage modification

from Defendants through the Home Affordable Modification Program ("HAMP") and similar

mortgage modifications programs utilized by Defendants.

    2.    Throughout the modification process Defendants have dealt in bad faith, made

numerous misrepresentations to Plaintiffs, required unjustifiable and unreasonable action by

the Plaintiffs to remain in consideration for a modification, and entered into an agreement with Plaintiffs which Defendant had no intention of honoring.

3.      Plaintiffs relied on statements, representations, and promises made by Defendants to their detriment while making a sincere effort to secure a permanent mortgage modification from Defendants. At Defendants urging, Plaintiffs defaulted on their mortgage based on Defendants representation that Plaintiffs could not negotiate a mortgage modification with Defendants while Plaintiffs were current on their mortgage payments. After enduring months of delay, misrepresentation, deception, and bad faith by Defendants, Defendants and Plaintiffs finally contracted to enter into a three month trial modification arrangement; the Plaintiffs' successful completion of which entitled Plaintiffs to a permanent modification of their mortgage with Defendants. Defendants represented to Plaintiffs that their pending foreclosure proceeding would be placed on hold while Plaintiffs were in this trial-modification period.

4.      Pursuant to a written contract, Plaintiffs timely offered, and Defendants willingly accepted, payments on the three month trial-modification for <u>seven</u> months, the whole time misrepresenting to Plaintiffs that a permanent modification would be forthcoming. Despite Plaintiffs extraordinary efforts to fully comply with Defendants' contradictory and often unreasonable instructions and demands, <u>Defendants arbitrarily, capriciously, and in breach of contract, denied Plaintiffs a permanent modification</u>. As it happened, upon information and belief, Defendants also never in fact put the Plaintiffs foreclosure on hold, allowing arrearages, costs, and fees to continue to accrue at the default interest rate and causing further damage to Plaintiffs. Plaintiffs are currently defendants in a foreclosure action brought by JPMorgan Chase in Nassau County Supreme Court.

5.    Plaintiffs bring this action for actual damages, punitive damages, costs, attorney fees, as well as injunctive relief for breach of contract, breach of duty of good faith and fair dealing, breach of implied contract, promissory estoppel, fraud, and negligent misrepresentation.

## II - JURISDICTION AND VENUE

6.    This court has subject matter jurisdiction pursuant to *28 U.S.C. §1332(a)* as Plaintiffs and Defendants are citizens of different States and the matter in controversy, exclusive of interest and costs, exceeds $75,000.

7.    Venue is proper under *28 U.S.C. §1391(a)* as a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District of New York, and the property for which Defendants are the mortgage holder and loan servicer is located in this District.

8.    The Court has personal jurisdiction over the Defendants to the action because Chase Home Finance and JPMorgan Chase, do substantial business in the State of New York.

## III - PARTIES

9.    Plaintiff Joseph Picini, Jr. is a resident of New York State and at all times relevant to this action lived at his home located at 22 Matthew Street, Farmingdale, New York 11735.

10.    Plaintiff Michelle Picini is a resident of New York State and at all times relevant to this action lived at her home located at 22 Matthew Street, Farmingdale, New York 11735.

11.    Defendant Chase Home Finance LLC is a mortgage bank and home mortgage loan servicer incorporated in Florida, with its principal place of business at 194 Wood Avenue South, 2nd Floor, Iselin, New Jersey 08830, and upon information and belief, is a wholly-owned subsidiary of JPMorgan Chase Bank, N.A.

12.     Defendant JPMorgan Chase Bank, N.A. is a national banking association whose articles of association declare that its main office is located in the City of Columbus, County of Delaware, State of Ohio.

## IV - FACTUAL BACKGROUND

### A.     Home Affordable Modification Program Procedure and Guidelines

13.     In February 2009 President Obama introduced the Making Home Affordable program (hereafter "MHA") in order to help stabilize the housing market and help struggling homeowners avoid foreclosure. In March 2009 the United States Department of the Treasury created the Home Affordable Modification Program (hereafter "HAMP") pursuant to their authority under the MHA. HAMP provided uniform guidance and uniform guidelines participating mortgage lenders and servicers in order allow eligible borrowers the opportunity to modify their first lien mortgage loans and make them more affordable.

14.     Mortgage loans are made more affordable through the application of interest rate reduction, term extension, principal forbearance, and principal forgiveness. To encourage lenders to agree to these mortgage modifications the Treasury Department provided for a schedule of financial incentives to lenders who successfully entered into permanent modification agreements. The Treasury Department appointed Fannie Mae as Program Administer and Freddie Mac as the Compliance Agent, each in their capacity as a financial agent of the United States.

15.     On July 31, 2009, JPMorgan Chase signed a "Servicer Participation Agreement for the Home Affordable Modification Program under the Emergency Economic Stabilization Act of 2008" with Fannie Mae, agreeing to participate in HAMP and binding itself to its terms and guidelines. By entering into this agreement, JPMorgan Chase covenanted that:

> Subject to Section 10.C, Servicer shall perform the loan modification and other foreclosure prevention services . . . . described in (i) the Financial Instrument attached hereto . . . (ii) the Program guidelines and procedures issued by the treasury, including, but not limited to, business continuity requirements, compliance requirements, performance requirements and related remedies, issued by the Treasury, Fannie Mae, or Freddie Mac in order to change, or further describe or clarify the scope of, the rights and duties of the Participating Servicers in connection with the Program . . . .

16.    Upon information and belief, Chase Home Finance also signed the HAMP Contract with Fannie Mae in or about April 2009.

17.    The Making Home Affordable Program Handbook for Servicers of Non-GSE Mortgages Version 1.0[1] was issued by the United States Department of the Treasury to provide lenders and servicers participating in HAMP with instructions on how to evaluate borrowers and sets forth the acts required in order to enter into a permanent modification agreement.  Both Chase Home Finance and JPMorgan Chase were legally bound to comply with the HAMP Guidelines pursuant to the HAMP Contract.

18.    The HAMP Guidelines provide instructions and criteria for virtually every facet of the mortgage modification process.  For example, the HAMP Guidelines set forth the criteria for lenders to utilize to evaluate eligible borrowers.  Among other applicable criteria, a loan is eligible if the servicer verifies that:

> The mortgage loan is a first lien mortgage loan originated on or before January 1, 2009 . . . ;
> The mortgage loan is delinquent or default is reasonably foreseeable . . . ;
> A borrower has documented a financial hardship and represented that he or she does not have sufficient liquid assets to make the monthly mortgage payments . . . ;

---

[1] Upon information and belief, all acts and omissions alleged to have been committed by Defendants occurred under this version of the MHA guidelines or under identically worded sections and paragraphs under the subsequently issued versions.  Version 2.0 became effect on September 22, 2010 and Version 3.0 became effect on December 2, 2010.  Updated versions of the MHA guidelines may be referenced when contradictory, if appropriate.

The borrower's monthly mortgage payment (including principal, interest, taxes, insurance . . .) prior to the modification is greater than 31 percent of the borrower's verified monthly gross income . . . ;
The current unpaid principal balance (UPB) of the mortgage loan prior to capitalization is not greater than . . . $729,750 . . . .

It is important to note that even a "borrower in active litigation regarding the mortgage loan is eligible for HAMP.

19.     Chapter III[2] of the Guidelines similarly provide for eligibility criteria for borrowers receiving unemployment insurance to receive a forbearance plan. When a borrower is unemployed and seeking assistance from a servicer participating in HAMP, the HAMP Guidelines proclaim that the servicer "must follow the guidance set forth in [Chapter III]."

20.     The HAMP Guidelines actually place an affirmative duty upon participating servicers, such as Defendants, to solicit potentially eligible borrowers. For example, "[s]ervicers must pre-screen all first lien mortgage loans where two or more payments are due and unpaid to determine if they meet the . . . basic criteria for consideration under HAMP . . . ." and "[s]ervicers must proactively solicit for HAMP any borrower whose loan passes this pre-screen, unless the servicers has documented that the investor is not willing to participate in HAMP . . . ." The Guidelines prescribe that a "reasonable effort" must be set forth in order for a participating servicer, such as Defendants, to solicit potentially eligible borrowers.

21.     Section 4 of Chapter II governs the categories of information that a borrower must provide a lender in order for an eligibility determination to be made (hereafter collectively referred to as the "Initial Package"). Paragraph 4.3 of Section 4 mandates the borrower to provide evidence of income. In part, this paragraph reads that "[t]he income documentation

---

[2] Chapter III of the HAMP Guidelines set forth guidelines and directions for the Home Affordable Unemployment Program (hereafter "UP"), for borrowers whose hardship is related to unemployment.

may not be more than 90 days old as of the date the documentation is received by the servicer." It continues to state that there is "**no requirement to refresh** the income documentation **during the TPP** [temporary payment plan]" (emphasis added).

22. The evidence of income mandated by Section 4 is to be illustrated by the documentation provided for in Section 5 of Chapter II of the Guidelines. Paragraph 5.1.1, titled "Wage or Salary Income," requires "[e]ach wage earning borrower [to] provide copies of two recent pay stubs, not more than 90 days old at time of submission, indicating year-to-date earnings."

23. After a lender or servicer and a borrower have begun the HAMP modification progress, the Guidelines contains mechanisms to prevent a mortgage from unnecessarily entering into foreclosure. Paragraph 3.1 of Chapter II and paragraph 3 of Chapter III of the HAMP Guidelines contain "Protections Against Unnecessary Foreclosure," and call for a moratorium on referring any loan to foreclosure unless and until certain listed factors exist.

24. After borrowers submit a request for consideration under HAMP after their loans have been referred for foreclosure, Paragraph 3.2 of Chapter II of the HAMP Guidelines explicitly mandates that:

> With respect to a borrower who submits a request for HAMP consideration after a loan has been referred to foreclosure, the servicer must, immediately upon the borrower's acceptance of a TPP based on verified income, and for the duration of the trial period, take those actions within its authority that are necessary to halt further activity and events in the foreclosure process, whether judicial or non-judicial, including but not limited to refraining from scheduling a sale or causing a judgment to be entered (emphasis added).

Thus, under the Guidelines a borrower who has entered into a temporary payment plan (hereafter "TPP") is entitled to have all activities in foreclosure process halted at that time. In addition, the Guidelines inform servicers that they "should service

mortgage loans during the TPP in the same manner as they would service a loan in forbearance" (emphasis added).

25. Upon a borrower's successful completion of the Initial Packet, the HAMP Guidelines at chapter II, sections 6 and 7 provide the steps the bank must take to determine whether a borrower qualifies for a TPP. If the borrower qualifies for a TPP, they enter into a trial period governed by the terms set forth in the TPP notice. It is important to note that in setting forth the initial eligibility requirements for HAMP the HAMP Guidelines specifically mandate that "[t]he servicer may not require a borrower to waive legal rights as a condition of HAMP."

26. According to the Chapter II, section 8 of the HAMP Guidelines, "[b]orrowers who make all trial period payments timely and who satisfy all other trial period requirements will be offered a permanent modification" (emphasis added), and Chapter II, section 9 of the HAMP Guidelines governs the borrower's receipt of that permanent modification. This section reads, in relevant part, "[a] borrower in a TPP may receive a permanent modification as long as the servicer has received all required trial period payments timely and all other required documentation from the borrower . . . . ," and instructs that "[a] servicer should prepare the Modification Agreement early enough in the trial period to allow sufficient processing time so that the modification becomes effective on the first day of the month following the final trial period."

**B.     Chase Home Finance and JPMorgan's Chase's Incentive to Deceive Borrowers**

27. HAMP, created by the U.S. Treasury Department to strike a balance between the interests of lenders, servicers, and borrowers by providing financial incentive to lenders and

servicers to negotiate mortgage modifications with borrowers according to uniform

guidelines, has in many ways been a failure due to abuses by lenders and servicers.[3]

28.    Since HAMP's inception in April 2009, through November 2010, the number of

trial modifications cancelled by participating servicers like Chase Home Finance has vastly

exceeded the number of conversions to permanent modifications.  Of the approximately 1.4

million trial modifications started, approximately 729,000 were cancelled, while only about

505,000 trials were converted to permanent modifications.  See Troubled Asset Relief

Program: Status of Programs and Implementation of GAO Recommendations, Jan. 12, 2011,

GAO-11-74, at 46.[4]  According to Olga Pierce & Paul Kiel, "[m]ore than half of [TPP] trials

were cancelled, most of the time despite the fact that the homeowner had made all of the

payments."[5]  In nearly one quarter of these modification rejections, the servicers cited

"missing" or "incomplete" documents as the reason for denial.  Id. (analyzing Treasury

Department data).

29.    Upon information and belief, the Defendants operate under a "deny and delay"

model, giving borrowers the run around, erecting endless barriers, forcing them to submit the

same paperwork repeatedly, returning or refusing to accept payments, and otherwise

thwarting qualifying borrowers' sincere and good-faith efforts to obtain permanent

modifications.  See Problems in Mortgage Servicing from Modification to Foreclosure:

---

[3] See Problems in Mortgage Servicing from Modification to Foreclosure: Hearing Before the S. Comm. On
Banking, Housing, and Urban Affairs, 111th Cong., at 3 (Nov., 16, 2010) (written testimony of Diane E.
Thompson, national Consumer Law Center), available at
http://banking.senate.gov/public/index.cfm?FuseAction=Files.View&FileStore_id=c1fac0f6-5ac5-4ae5-85cc-
e2220255dfd9; Olga Pierce & Pail Kiel, ProPublica, By the Numbers: A Revealing Look at the Mortgage Mod
Meltdown, Mar. 8, 2011, available at http://www.propublica.org/article/by-the-numbers-a-revealing-look-at-
the-mortgage-mod-meltdown.
[4] Available at http://www.gao.gov/new.items/d1174.pdf.
[5] Olga Piece & Pail Kiel, ProPublica, By the Numbers: A Revelaing Look at the Mortgage Mod Meltdown, Mar.
8, 2011, available at http://www.propublica.org/article/by-the-numbers-a-revealing-look-at-the-mortgage-mod-
meltdown.

*Hearing Before the S. Comm. On Banking, Housing, and Urban Affairs*, 111th Cong., at 9-13 (Nov. 16, 2010) (written testimony of Diane E. Thompson, national Consumer Law Center describing examples of how servicers drag out the mortgage modification process).[6] Defendants have clear motivation to drag out the modification process for as long as possible as fees and interest continue to accrue. See id. at 11.

30.     Since servicers get to take their foreclosure-related fees off the top of foreclosure proceeds, Defendants incentive to protract the modification process and maximize their revenue is clear. See id. at 19-36. According to Pierce & Kiel, based on a review of Treasury Department data, JPMorgan Chase and its affiliates have denied modifications, cancelled modification trial periods, and left borrowers in limbo at a rate of approximately 57%.[7] Upon information and belief, Defendants Chase Home Finance and JPMorgan Chase have instituted a scheme under the guise of HAMP to purposefully delay mortgage modifications in order to collect excessive fees [on troubled mortgages] from troubled homeowners.[8]

## C.     Plaintiffs' Attempts to Obtain a Permanent Modification from Defendants

31.     On or about October 4, 2005, Plaintiffs executed and delivered a note in the amount of $359,650.00 to JPMorgan Chase, along with a mortgage in the same amount upon the real property located at 22 Matthew Street, Farmingdale, New York 11735. This property has served as the residence for Plaintiffs and their three children since 1997.

---

[6] *Available at* http://banking.senate.gov/public/index.cfm?FuseAction=Files.View&FileStore_ id=c1fac0f6-5ac5-4ae5-85cc-e2220255dfd9.

[7] See Pierce & Kiel, *supra*, note 3.

[8] See DIANNE E. THOMPSON, NAT'L CONSUMER LAW CTR, WHY SERVICERS FORECLOSE WHEN THEY SHOULD MODIFY AND OTHER PUZZLES OF SERVICER BEHAVIOR vi (2009) (describing how the monthly fee that a services receives is based on a percentage of the outstanding principal of the loan in the pool, providing some incentive to servicers to keep loans in the pool rather than foreclosing them, but disincentive to offer principal reductions or other loan modifications that would diminish the amount held in the pool, and gives servicers the incentive to continue to accrue amounts and fees).

32.    On or about October 31, 2008, Plaintiff Joseph Picini was laid off from his job of 14 years.[9]

33.    Shortly after Plaintiff Joseph Picini was laid off, Plaintiffs contacted Chase Home Finance to inform it of their situation and to inquire as to obtaining a modification of their mortgage loan.

34.    At that time however, Defendants advised Plaintiffs that nothing could be done for them until they fell at least three months behind on their payments.

35.    Based upon Defendants advice, Plaintiffs failed to tender their December 2008 mortgage payment.

36.    In or about January 2009, Plaintiff Joseph Picini began to receive unemployment insurance.  He would continue to receive these payments until they were exhausted in early 2010.

37.    On or about January 28, 2009, Plaintiffs received a letter from Defendants informing Plaintiffs that their loan was 58 days in default and that Plaintiffs were in danger of losing their home.

38.    Upon receipt of this letter, Plaintiffs contacted Defendants to inquire as to help with their mortgage, however, Defendants represented that there was nothing Defendants could do to cooperate with that request.

39.    Beginning in or about March 2009, and continuing through in or about January 2010, Plaintiffs received harassing phone calls from the Defendants, as often as three times a day, interrogating Plaintiffs about their failure to make their mortgage payments.

---

[9] At all relevant times, Plaintiff Michele Picini has been a stay at home mother.

40.    Each time Defendants called Plaintiffs to inquire as to their mortgage payments Plaintiffs explained their situation to Defendants and repeatedly requested that Defendants work with them towards obtaining a mortgage modification or forbearance agreement.

41.    Defendants, however, continued to represent to Plaintiffs that there was nothing Defendants could do to work on a solution with them,

42.    On May 6, 2009, Defendants mailed Plaintiffs a letter informing Plaintiffs that their loan had been forwarded to an attorney to begin foreclosure proceedings.

43.    Once again Plaintiffs contacted Defendants in order to attempt to work on a solution, however, once again Defendants represented that nothing could be done.

44.    On May 15, 2009, Plaintiffs filed for bankruptcy under Chapter 7 of the Bankruptcy Code and on June 10, 2009, Defendants, through their attorneys, filed for relief from the automatic stay.  On July 23, 2009, an order was issued from the bankruptcy court lifting the automatic stay.

45.    In September 2009, JPMorgan Chase initiated a foreclosure proceeding against Plaintiffs by filing a summons and complaint in New York State Supreme Court, Nassau County (hereafter "Foreclosure Action").

46.    Plaintiffs reiterated their request to enter into some type of mortgage modification negotiation but were continuously frustrated by Defendants representations that no such negotiations could occur.

47.    On November 17, 2009, Plaintiffs received a request to schedule a settlement conference in the Foreclosure Action.

48.    Plaintiffs continued to plead unsuccessfully with Defendants to enter into a modification negotiations.

49. In January 2010, Plaintiff Joseph Picini opened his own business and employed himself as a 1099 employee.

50. Plaintiffs immediately notified Defendants of this development and once again asked Defendants to work with them, however, Defendants remained steadfast in their refusal to work with Plaintiffs towards obtaining a mortgage modification.

51. In or about February 2010, Plaintiffs appeared at a Settlement Conference on the Foreclosure Action *pro se* and pled with JPMorgan Chase's attorney to let them into a modification program. Once again Plaintiffs' request was denied.

52. Finally, in or about February 2010, and after Plaintiffs had appeared at the Settlement Conference in the Foreclosure Action, Plaintiffs were informed by a friend about the MHA program.

53. Despite being in default for over a year, Chase had <u>never</u> offered to even evaluate whether Plaintiffs qualified to attempt a modification through HAMP or for forbearance through UP, and in fact, continuously represented to Plaintiffs that nothing could be done to help them.

54. On February 17, 2010, Plaintiffs completed their Initial Package and returned it to Defendants. At that time, they were informed that Ms. Sarah (Patty) Letellier (hereafter "Letellier") was assigned to their file.

55. On March 12, 2010, Plaintiffs were informed in writing by Defendants that Plaintiffs had been approved for a three month TPP (hereafter "TPP Contract").

56. At or about this time, Defendants represented to Plaintiffs that once Plaintiffs successfully completed their TPP it was "pretty definite" that the modification would become permanent.

57.   By its terms, the TPP Contract called for payments to be made in the sum of $1,600.02 and required strict compliance with its terms by Plaintiffs.

58.   Defendants on the other hand, chose not to bind itself to much of anything.

59.   In fact, Defendants "reserved the right to determine the final amounts of the unpaid interest and any other delinquent amounts (except late charges) to be added to [Plaintiffs'] loan balance in order to determine a <u>new payment amount</u>," (emphasis added), basically reserving Defendants free reign to upwardly adjust Plaintiffs' modification payments after accepting three months worth of lower payments under the TPP Contract.

60.   In the TPP Contract, Defendants covenanted that upon Plaintiffs' obedient completion of the terms of the TPP Contact Defendants "<u>will</u> send [Plaintiffs] a Modification Agreement for [Plaintiffs] signature which will modify the Loan as necessary to reflect this new amount" (emphasis added).

61.   However, one sentence further into the TPP Contract Defendants immediately contradicted that commitment by stating that that "[i]f all payments are made as scheduled, we will <u>consider</u> a permanent workout solution for your loan" (emphasis added).

62.   In addition, the TPP Contract including a mandatory acknowledgement from the Plaintiffs that in the event Plaintiffs "filed a petition in bankruptcy, CHASE may elect to take any and all actions necessary, including, but not limited, to <u>voiding</u> this Agreement, filing a Motion for Relief from the Automatic Stay or a motion to dismiss or any permitted state law remedies, which in CHASE's judgment are reasonably necessary to secure or protect our security interest and/or to enforce our rights under the original terms of your Loan" (emphasis added).

63.   Contemporaneously with offering the TPP, Defendants represented to Plaintiffs that the Foreclosure Action would be put on hold while Plaintiffs were in this program.

64.   On or about April 1, 2010, Plaintiff's made their first payment under the TPP.

65.   On or about May 1, 2010, Plaintiff's made their second payment under the TPP.

66.   On May 26, 2010, Defendants mailed Plaintiffs a letter acknowledging their participation in MHA and reminding them that a payment was due June 1, 2010. This letter reminded Plaintiffs that they were "required to make trial plan payments as a condition of approval for a permanent modification," however this letter failed to provide Plaintiffs with any information as to whether a permanent modification might be forthcoming.

67.   Defendants in fact made no communication to Plaintiffs as to their status for a permanent modification prior to, contemporaneously with, or subsequent to, this mailing.

68.   At or about the time of Plaintiffs receipt of the letter, Plaintiffs contacted Defendants and spoke with Letellier to inquire as to what Plaintiff's should do as Plaintiffs had only one TPP coupon left and had not yet received word on whether they had been approved for a permanent modification.

69.   At that time Letellier represented to Plaintiffs that she was no longer working with Plaintiffs, and referred Plaintiffs to a general number to find out what to do.

70.   Plaintiffs called the general number provided by Letellier and spoke to a representative of Defendants, who instructed Plaintiffs to make copies of their remaining TPP coupon and continue to make payments pursuant to the TPP.

71.   Defendants' representative represented to Plaintiffs that it would probably be some time before Plaintiffs heard anything about a permanent modification, and claimed that "the modification department was backed up."

72.    On or about June 1, 2010, Defendants mailed their third payment under the TPP.

73.    Plaintiffs then continued to make payments pursuant to the terms of the three-month TPP for **seven months**.  Plaintiffs received no written or telephonic communication from Defendants during this time.

74.    On October 18, 2010, Plaintiffs received a telephone call from a representative of Defendants named Bridget, who informed Plaintiffs that she was calling to update them on the status of the Foreclosure Action.

75.    Plaintiffs, having been previously been informed by Defendants that the Foreclosure Action was on hold during the TPP, assumed that Bridget must have been mistaken.

76.    Bridget initially claimed to have no knowledge of Plaintiffs' enrollment in HAMP, or of the fact that Plaintiffs had been making payments pursuant to a TPP for **seven months**.

77.    After approximately thirty minutes on the phone with Plaintiffs however, Bridget began to "find" information regarding Plaintiffs' TPP and represented to Plaintiffs that Plaintiffs had purportedly been dropped from the program on October 3, 2010.  Bridget also alleged that a letter had been sent to the Plaintiffs that same week informing them of that fact.

78.    Plaintiffs had in fact never been notified that they had been dropped from the program.

79.    To this date Plaintiffs have never received the letter Bridget purports Defendants to have sent.

80.    Bridget alleged that Plaintiffs had been dropped because Plaintiffs failed to respond to a request for updated documents purportedly sent by Defendants in July.[10]

---

[10] However, months later, in a response to an inquiry from the Office of Congressman Peter King, Congressman King's office was informed that the reason Plaintiffs were dropped from the program is that "[a]fter completing

81.  Plaintiffs never received any request for updated documents.

82.  Bridget then represented to Plaintiffs that they could re-apply to for a HAMP modification.

83.  Early in this conversation Bridget represented to Plaintiffs that they were already in active foreclosure, however, at the close of this conversation Bridget represented to Plaintiffs that their foreclosure would become active again on February 7, 2011.

84.  Bridget also instructed Plaintiffs that they <u>should continue to make their payments as they had been doing</u>.

85.  In shock and disbelief, Plaintiffs went to a local Chase branch in Farmingdale, New York and spoke to the branch manager named Risa.  Risa made a phone call to Defendants on their behalf and spoke to an unnamed representative, who told Risa the same information that Bridget had informed Plaintiffs.

86.  This unnamed representative also instructed Plaintiffs that they <u>should continue to make their payment as they had been doing</u> or else Defendants would put Plaintiffs back into foreclosure.

87.  At or about this time, Plaintiffs filed complaints with United States Congressman Peter King, State Senator Charles Fuschillo, and State Assemblymen Joseph Saladino regarding their interactions with Defendants, and provided Congressman King's and Assemblymen Saladino's office with supporting documentation.[11]

88.  Shortly after these conversations, Plaintiffs received a letter from Chase <u>congratulating</u> them on completing their TPP.

---

the trial program, the customer was informed that his account was <u>delinquent</u> and that he would be in active foreclosure in February 2011."

[11] Plaintiffs also put in complaints with Senator Schumer's office and with the Office of the Attorney General of New York State.

89. When Plaintiffs called the number on the letter Plaintiffs were once again informed by a representative of Defendants that Plaintiffs had been dropped from HAMP.

90. When Plaintiff's inquired as to why they had received the letter, Defendants represented that "[he] [didn't] know, they just get sent out."

91. Plaintiffs' then began to receive letters sent by Defendants encouraging them to attend local "Homeowner Assistance Events" to work on obtaining a mortgage modification.

92. On October 29, 2010, Plaintiffs received a phone call from Defendants responding to complaints made on Plaintiffs behalf, and assigned Plaintiffs a manager from the "Chase Resolutions Group" named Loretta Stephens (hereafter "Stephens"). Defendants provided Plaintiffs with Stephens extension and e-fax and told Plaintiffs that Stephens would contact them.

93. On October 30, 2010, after accepting payments pursuant to the TPP from Plaintiffs for seven months, Defendants sent Plaintiffs a letter alleging that Defendants had "not received all documents necessary to complete [their] request for a modification."

94. In this letter, Defendants acknowledged that Plaintiffs were "currently in a Trial Period Plan," however, Defendants alleged that Plaintiffs had not provided documents that Defendants purported to have previously requested.

95. In this letter, Defendants claimed that they would terminate Plaintiffs TPP (despite the fact that weeks earlier Defendants represented to Plaintiffs that they had already been dropped from the program) unless certain documents were received. Among these documents were

- Two (2) most recent pay stubs indicating Year to Date Earnings
- Most recent federal tax return, including Schedule E – Supplement Income and Loss

- A completed 4506T-EZ – Short Form Request for Individual Tax
  Return Transcript
- Request for Modification and Affidavit
- Two (2) most recent months consecutive complete bank statements

96.    On November 1, 2010, Plaintiffs contacted Stephens after Stephens had failed to

contact them.  Stephens represented to Plaintiffs that the only paperwork she needed was:

- two months of current banking statements, both business and
  personal
- recently quarterly profit/loss statement

97.    On November 3, 2010, Plaintiffs faxed the requested documentation to Stephens at

a fax number Stephens had provided to, and confirmed for, them.  Two hours after sending

the fax, Stephens telephoned Plaintiffs and represented to Plaintiffs that she did not receive

the fax.  Stephens told Plaintiffs that the number she had given and confirmed to them earlier

was not in fact the proper number, and gave them a new number to which to send the

documentation.  Stephens said she had no idea where Plaintiffs sensitive financial documents

had been sent.  Plaintiffs faxed the requested documentation to the new number and Stephens

confirmed receipt.

98.    Pursuant to Defendants' instructions, Plaintiffs tendered a payment for November

2010, in the amount agreed upon in the TPP.

99.    On November 5, 2010, Stephens telephoned Plaintiffs and represented to them that

she was reviewing their documentation, however, she would need additional documents in

the form of:

- a 4506T form
- a 2009 tax return
- a request for modification and affidavit
- one more business account bank statement
- a hardship letter.

Plaintiffs had previously sent these documents to Defendants, and Defendants previously received these documents from Plaintiffs, prior to entering into a TPP in March 2010.[12] Plaintiffs subsequently faxed 70 pages of requested documentation to Defendants.

100.   On November 8, 2010, Plaintiffs repeatedly attempted to contact Stephens to confirm the receipt of their second fax, however, Defendants phones were malfunctioning.[13] Finally, around 4:10pm, Plaintiffs contacted Stephens who confirmed her receipt of their second set of documents however she claimed she had not yet reviewed them yet.  Stephens told Plaintiffs that she would call them by the end of the business day on November 9th.

101.   Plaintiffs did not hear from Stephens for the rest of that week.

102.   On or about November 13, 2010, Plaintiffs received a letter from Defendants dated November 5, 2010, returning Plaintiffs' November payment.  Plaintiffs called the telephone number on the letter and spoke to a representative of Defendants named Ella.  Ella represented to Plaintiffs that Defendants could not accept payments while Plaintiffs were in active foreclosure.  Plaintiffs informed Ella that their foreclosure would not become active again until February 7, 2011, and also, Plaintiffs were told by Defendants that they could not be in foreclosure while Plaintiffs were making payments.  Ella alleged that Plaintiffs were mistaken, and represented that Plaintiffs could be put back into foreclosure while they were making payments, which would then cause the Plaintiffs' payment to be returned since the Plaintiffs would then be in foreclosure.  When Plaintiffs pointed out the absurdity of such a situation, Ella told Plaintiffs that "it was really hard to explain."

---

[12] Specifically, upon information and belief, the 4605T form, the 2009 tax return, a request for modification and affidavit, and the hardship letter.

[13] On multiple occasions throughout this process when Plaintiffs would attempt to contact a representative of Defendants, Defendants phones would stop ringing and turnover to a "log-on message" and ask for a password.

103. Later that same day, Plaintiffs called and spoke to a representative of Defendants named Rob, who represented to Plaintiffs that Defendants would not accept any more payments until Plaintiffs were approved for another modification. When Plaintiffs inquired as to why Defendants would accept **seven** months worth of payments prior to returning the November payment, Rob alleged that this "must be one of those cases that slipped through the cracks."

104. Plaintiffs also spoke to Stephens that same day, November 13, 2010. Stephens represented to Plaintiffs that their documentation had been sent to underwriting, and she did not think that there was anything else Plaintiffs needed to send.

105. On November 19, 2010, Plaintiffs called Stephens to follow-up on the status of their modification. At this time Stephens represented to Plaintiffs that she could not find any of the documents which Plaintiffs had sent them. When asked if these documents were in underwriting, Stephens claimed that this was not possible, or else it would be noted in the file. Stephens claimed that the documentation was not in the file and that there was "a problem with [Defendants'] fax system; one day something is in the system and the next day it's gone." Stephens asked Plaintiffs to send all their documentation over again. Plaintiffs once again sent the requested documents, this time by overnight Federal Express.

106. On November 23, 2010, Plaintiffs contacted Stephens to confirm the receipt of the Federal Express delivery. Stephens claimed that it was currently in the mailroom and that she would have it on her desk by the next day, the latest.

107. That same day, Plaintiffs received a phone call from a gentleman named Michael who worked for Congressman Peter King. Michael informed Plaintiffs that Defendants had responded to Congressman King's office's inquiries by representing that Plaintiffs had not

been responding to an October 30, 2010 request for documents that were needed to get
Plaintiffs back into the modification program.  Plaintiffs were bewildered by such a
representation by Defendants, as Plaintiff had faxed over the requested paperwork twice and
sent it a third time by overnight Federal Express.

108.  Michael also informed Plaintiffs that Defendants also had represented to
Congressman King's office that Plaintiffs had been dropped from the program because
Plaintiffs were delinquent after the three month TPP.  Plaintiffs were perplexed by
Defendants latest allegation, as Plaintiff had sent all eight payments by certified mail and had
signed receipts for all payments that were made, including the November 2010 payment
which Defendants had returned.

109.  On November 24, 2010, Stephens once again represented to Plaintiffs that their
documentation had been sent to underwriting.

110.  After Plaintiffs attempted to get though to Stephens on November 29th and 30th, on
December 1, 2010, Plaintiffs finally secured contact with Stephens.  At this time Stephens
represented to Plaintiffs that she had not yet heard back from underwriting, and to get back to
her in 48 to 72 hours.

111.  On December 6, 2010, Plaintiffs repeatedly attempted to contact Stephens but could
not get through.

112.  On the same day, Plaintiffs received a letter from Defendants dated December 1,
2010.  In this letter, Defendants alleged that Plaintiffs had not provided all the documentation
required in order to be considered for a TPP.  This time, Defendants purported to require:

- Most recent quarterly or year-to-date profit/loss statement
- Four (4) most recent months consecutive complete banks
  statements, including both business and personal statements
- Most recently quarterly or year-to-date profit/loss statement

In a prior letter alleging deficient documents, Defendants requested merely two (2) months of bank statements. Defendants also requested a quarterly profit/loss statement [which had been submitted previously by Plaintiffs] **twice** in this one letter.

113. Upon receipt of this letter, Plaintiffs telephoned Defendants and spoke with a representative named Samantha. Plaintiffs asked Samantha why they were receiving letters from her department when they have been working with Stephens, to which Samantha replied that she saw nothing in Plaintiffs' file indicating that they had been working with Stephens.

114. Samantha did notice a note in Plaintiffs' file however alleging that Defendants required more information from Plaintiffs. This note had been entered by Stephens. Samantha then put Plaintiffs through to the "Imminent Default Department," where Plaintiffs were given a representative of Defendants named Patricia.

115. Patricia once again requested documentation which Plaintiffs had previously submitted, but this time asked Plaintiffs to mail the documents to different address then Plaintiffs had previously been provided with. Patricia also requested another month of bank statements, as it was now December and Plaintiffs had submitted their bank statements to Defendants back in November.

116. Plaintiffs were mystified as Stephens had previously represented to them that their paperwork was compete and that it had been sent to underwriting.

117. On December 7, 2010, Plaintiffs repeatedly attempted to contact Stephens to settle the confusion about their file without success.

118. Frustrated, Plaintiffs contacted the Chase Executive Office and spoke with Karen Dalton (hereafter "Dalton"). Dalton instructed Plaintiffs not to respond to any letter they might receive and that they should only be working with Stephens.

119. On December 8, 2010, Stephens finally contacted Plaintiffs. This time, Stephens represented to Plaintiffs that Defendant's underwriters required:

- all statements from business account for October and November
- all statements from personal checking account
- year to date profit & loss statements for their business

Stephens provided Plaintiffs with yet another address to which to send the requested documentation. When Plaintiff informed Stephens of her conversation with Samantha and Patricia, Stephens represented to Plaintiffs that the documents that Samantha and Patricia had requested were **not** in fact being requested by underwriting.

120. Stephens also represented to Plaintiffs that she was putting a note in their file that Plaintiffs were working with her, however, she urged Plaintiffs to send Defendants a cease & desist letter asking them to stop sending letters from the other departments, which Plaintiffs subsequently did.

121. On December 9, 2010, Plaintiffs sent the additional requested paperwork via certified mail.

122. On December 10, 2010, Plaintiffs attempted to contact Stephens to confirm the receipt of the additional documents but could not get through to her.

123. On December 13, 2010, after once again not being able to get through to Stephens, Plaintiffs once again contacted Chase's Executive Offices. At this time, Plaintiffs spoke to Veronica, who put Plaintiffs through to Tiffany in the mortgage department. Tiffany gave

Plaintiffs a direct line to Stephens at this time, which Plaintiffs subsequently called and left Stephens a voice message.

124. Later that day, Stephens returned Plaintiffs' call and represented that she had not yet received the additional documentation.

125. On December 14, 2010, Stephens called Plaintiffs and represented to them that the paperwork had arrived in the building, but had not been delivered to her. Stephens did allege however that the department who received the paperwork had entered it into the system and sent it to underwriting.

126. On December 15, 2010, Stephens telephoned Plaintiffs and requested a copy of a bank statement from August, which Plaintiff's faxed that night.

127. On December 17, 2010, Stephens confirmed receipt of the August bank statement and represented to Plaintiffs that it was being sent to underwriting.

128. On December 30, 2010, Stephens represented to Plaintiffs that their file was still in underwriting being considered, and claimed that it would be another week or two until a decision was made.

129. On January 7, 2011, Stephens telephoned Plaintiff and requested additional documentation. This time Defendants requested

- all deposits from Plaintiffs' cleaning business along with cancelled checks or a checking statement
- November and December bank statements from one of Plaintiffs accounts

Plaintiffs informed Stephens that the cleaning business was a cash business, to which Stephens replied that a detailed letter explaining the use of the money would be required. Stephens provided a fax number to Plaintiffs to send this additional information to.

130. Plaintiffs faxed this additional paperwork to Defendants on January 11, 2011. Later that same afternoon, Stephens contacted Plaintiffs and represented to them that she had received this information.

131. On January 12, 2011, Plaintiffs received a letter from Defendants dated January 7, 2011 purporting to <u>require additional documentation</u>. This letter stated that Plaintiffs still had "not provided all of the documentation requested in our previous correspondence." This letter claimed that Defendants required:

- two (2) most recent months consecutive bank statements

132. Many weeks passed without word from Defendants as to the status of Plaintiffs modification. Plaintiff left Stephens many voice messages during this time, all of which went unreturned.

133. On January 18, 2011, Defendants responded to an inquiry from Congressman King's Office, representing to Congressman King that "<u>On December 14, 2010, Chase received the documents requested. The file was perfected and sent to underwriting.</u>"

134. In this same letter, Defendants represented to Congressman King that "[a]s of December 14, 2010, the account is due and is in active foreclosure."

135. Defendants had previously represented to Plaintiffs that they would not be placed back into active foreclosure until February 7, 2011.

136. On January 31, 2011, Plaintiffs received a letter from Defendants dated January 25, 2011 purporting to require additional documentation. This letter stated that Plaintiffs still had "<u>not provided all of the documentation requested in our previous correspondence.</u>" This letter claimed that Defendants required:

- Dodd-Frank Certification[14] form, completed and signed (unless previously-submitted)
- Two (2) most recent months consecutive complete bank statements
- Four (4) most recent months consecutive complete bank statements, including both business and personal statements
- Two (2) most recent months consecutive complete bank statements.

Plaintiffs were understandably at a loss, as this letter seems to ask for the same previously submitted bank statements three times. This was Defendants' first request for a Dodd-Frank Certification from Plaintiffs, who had been attempting to secure a modification from Defendants since February 2010.

137.   On January 31, 2011, Plaintiffs completed and signed a Dodd-Frank Certification, and sent 2 months complete and consecutive banking statements, 4 months complete and consecutive banking statements, and 2 months of complete and consecutive banking statements to Defendants, exactly as Defendants had requested in their January 25th letter.

138.   On February 3, 2011, after continuing not to receive word from Stephens or Defendants regarding their modification, Plaintiffs sent a letter, along with supporting documents, to Defendants' executive office, Nassau County District Attorney Kathleen Rice, and State Supreme Court Justice Dana Winslow.

139.   Later that day, Plaintiffs received a telephone call from Stephens alleging that everything Plaintiffs had last sent had been forwarded to underwriting. However, Stevens claimed that underwriting had come back to her and claimed not to have received any bank statements since September. This was despite Plaintiffs delivery of bank statements to Defendants in October, November, December, and January. Stephens also again requested a Dodd-Frank Certification.

---

[14] The Dodd-Frank Certification requirement became effective September 21, 2010. By the terms of the Guidelines, "offers outstanding as of the effective date of this requirement are not impacted by the Dodd-Frank Certification." See Making Homes Affordable Program Handbook for Servicers of Non-GSE Mortgages Version 3.0, as of December 2, 2010.

140. On February 4, 2011, Plaintiffs received a Dodd-Frank Certification form from Defendants to fill-out, which was immediately executed and sent back to Defendants.

141. On February 23, 2011, Stephens once again telephoned Plaintiffs and represented that all their paperwork had been sent to underwriting for approval, and asked for a week or two for underwriting to return with approval.

142. Once again, weeks went by without Defendants returning Plaintiffs calls inquiring as to the status of their modification.

143. On March 11, 2011, Plaintiffs called the number for Stephens and reached Stephens' voicemail representing that Stephens would be going on "extended leave," and leaving a 1-800 number for Plaintiffs to call. Plaintiffs called the 1-800 number provided by Stephens and spoke with a representative named "Paula," who represented to Plaintiffs that Plaintiffs would be assigned a new case worker within 72 hours.

144. On March 18, 2011, Plaintiffs contacted Defendants and spoke with a representative named Brandy, who informed Plaintiffs that their new case manager was actually Donna Hall (hereafter "Hall"), however, Brandy refused to provide Plaintiffs with a direct line for Hall and represented that she would email Hall and tell her to get in touch with Plaintiffs.

145. On March 23, 2011, Plaintiffs once again contacted Defendants and this time spoke with a representative named Charlene. After explaining their situation to Charlene, Plaintiffs were informed that their case had been reassigned to Ivan Justiniano (hereafter "Justiniano").

146. Charlene also represented to Plaintiffs, for the first time, that they had been denied a TPP on March 11, 2011. The purported reason for this denial was a "negative NPV." The case had been assigned to Justiniano to make sure the denial was correct.

147. On March 23, 2011, Plaintiffs received a letter from Defendants dated March 22, 2011, via UPS publicizing another "Homeowner Assistance Event" taking place March 31 through April 4, and advertising that Defendants "may be able to lower your monthly payment or your interest rate."

148. On March 24, 2011, Defendants representative Diane Carlson (herafter "Carlson") called Plaintiffs to inform that that she was their new case manager, and that their modification had been denied.

149. Carlson had no answer as to why Plaintiffs had been approved one year earlier for a TPP and denied one now.

150. On March 31, 2011, Congressman King's Office sent a letter to Plaintiffs informing them of Defendants response to their inquiries. Defendants represented to Congressman King's office that "As of 3/15/11, Mr. Picini was denied a loan modification due to negative net (NPV) present value." Notably, the figures provided by Defendants to Congressman King's Office were inconsistent with the financial records Plaintiffs had provided repeatedly to Defendants.

## V – CAUSES OF ACTION

### COUNT ONE

### Breach of Contract (Third Party Beneficiary Theory)

151. The Plaintiffs' first cause of action was been dismissed with prejudice by the February 16, 2012 Order of this Court.

## COUNT TWO

### Breach of the Duty of Good Faith and Fair Dealing (Third Party Beneficiary Theory)

152.    The Plaintiffs' second cause of action has been dismissed with prejudice by the February 16, 2012 Order of this Court.

## COUNT THREE

### Breach of Direct Contract with Plaintiffs

153.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in paragraphs 1 to 152 above as if fully set forth herein.

154.    On March 12, 2010, Defendants offered to enter into a contractual relationship with Plaintiffs for a TPP. Plaintiffs accepted Defendants offer and made its first payment to Defendants under the contract on April 1, 2010.

155.    On or about July 1, 2010, Defendants breached their contract with Plaintiffs by failing to provide them with a permanent loan modification upon Plaintiffs successful completion of the TPP.

156.    On or about October 18, 2010, Defendants breached their contract with Plaintiffs when it informed Plaintiffs that Defendants, without justification, would not offer Plaintiffs a permanent loan modification as called for under the contract.

157.    Plaintiffs were damaged as a direct and proximate result of the Defendants breach of contract. Plaintiffs have suffered financial harm, psychological distress, and the loss of opportunity to attempt other methods of saving their home from foreclosure as a result of Defendants' breach.

## COUNT FOUR

### Breach of the Duty of Good/Faith and Fair Dealing in Direct Contract with Plaintiffs

158. Plaintiffs re-allege and incorporate by reference each and every allegation set forth in paragraphs 1 to 157 above as if fully set forth herein.

159. Defendants routinely and regularly breached their duties of good faith and fair dealing under their contract with Plaintiffs from March 2010 through October 2010 in the following ways:

a. Upon information and belief, misrepresenting to Plaintiffs Defendants' willingness to enter into a permanent modification agreement;

b. Misrepresenting to Plaintiffs the requirements for achieving a permanent modification;

c. Misrepresenting to Plaintiffs the status of their modification applications;

d. Failing to timely communicate with Plaintiffs the status of their permanent modification;

e. Upon information and belief, requesting and accepting payments from Plaintiffs under the TPP as a condition for receiving a permanent loan modification without any intention to permanently modify Plaintiffs' loan;

f. Upon information and belief, pursuing foreclosure by continuing the Foreclosure Action while Plaintiffs were in a TPP;

g. Failing to offer Plaintiffs a permanent loan modification upon completion of Plaintiffs three month TPP;

h. Upon information and belief, instructing Plaintiffs to continue to make payments upon Plaintiffs successful completion of Plaintiffs three month TPP without any intention of approving Plaintiffs for a permanent modification;

i. Upon information and belief, accepting Plaintiffs payments made subsequent to their successful completion of the TPP for four months without any intention of approving Plaintiffs for a permanent modification;

j. Deliberately acting to delay, prolong, or otherwise frustrate Plaintiffs' loan modification process;

k. Arbitrarily and capriciously denying Plaintiffs a permanent loan modification without justification under the contract.

160. Plaintiffs were damaged as a direct and proximate result of the Defendants aforementioned breaches of its duty of good faith and fair dealing. Plaintiffs have suffered financial harm, psychological distress, and the loss of opportunity to attempt other methods of saving their home from foreclosure as a result of Defendants' breach.

## COUNT FIVE

### Breach of Implied Contract, In the Alternative

161. Plaintiffs re-allege and incorporate by reference each and every allegation set forth in paragraphs 1 to 160 above as if fully set forth herein.

162. From on or about February 2010 through October 2010, and throughout their course of conduct, Defendants formed a contract with Plaintiffs to permanently modify their mortgages.

163. This course of conduct included, but is not limited to:

    a. Promising Plaintiffs a permanent mortgage modification upon Plaintiffs successful completion of their TPP;

    b. Instructing Plaintiffs to continue paying Defendants pursuant to the terms of the TPP while representing to Plaintiffs that approval of a permanent modification would be forthcoming; and

    c. Accepting payments from Plaintiffs for <u>seven months</u> pursuant to the terms of the TPP.

164.    Plaintiffs relied on their implied contract with Defendants by first beginning their TPP payments and then in continuing to make their payments after the initial three month TPP was successfully completed.

165.    In or about July 2010, Defendants breached their implied contract with Plaintiffs by failing to offer Plaintiffs a permanent modification after Plaintiffs successfully completed their initial three month TPP.

166.    In or about July 2010 through in or about October 2010, Defendants continuously breached their implied contract with Plaintiffs by failing to offer Plaintiffs a permanent modification, despite Defendants receipt of four additional months of TPP payments.

167.    Plaintiffs were damaged as a direct and proximate result of the Defendants aforementioned breach of their implied contract. Plaintiffs have suffered financial harm, psychological distress, and the loss of opportunity to attempt other methods of saving their home from foreclosure as a result of Defendants' breach.

## COUNT SIX

### Promissory Estoppel, In the Alternative

168.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in paragraphs 1 to 167 above as if fully set forth herein.

169.     In or about February 2010 and March 2010, Defendants made representations to Plaintiffs that if Plaintiffs performed under their TPP, Plaintiffs would receive a permanent loan modification.

170.     Upon information and belief, Defendants intended to induce Plaintiffs to rely on these representations and to make payments to Defendants pursuant to the terms of the TPP.

171.     In or about June 2010 and July 2010, when Defendants failed to present Plaintiffs with a permanent modification agreement upon Plaintiffs successful completion of their three month TPP, Defendants made representations that if they continued to pay Defendants pursuant to the terms of the TPP that Plaintiffs would receive a permanent loan modification.

172.     Upon information and belief, Defendants intended to induce Plaintiffs to rely on these representations and to make payments to Defendants after the original three month term of the TPP had been successfully completed.

173.     Plaintiffs did in fact reasonably rely on Defendants representation and submitted payments as Defendants requested beginning in April 2010 and continuing for a period of seven months.

174.     Plaintiffs' reliance on Defendants' representations was reasonable as Plaintiffs did not and could not know that that Defendants' representations were false.

175.    Plaintiffs relied on Defendants representations to their detriment.  Plaintiffs have yet to receive a permanent loan modification, have lost the opportunity to pursue other strategies to deal with their default and prevent foreclosure, have suffered financial harm by making payments to Defendants they otherwise would not have made had they known a permanent modification would be denied arbitrarily, capriciously, and without justification, suffered psychological distress, and given up valuable time and extended substantial efforts in complying with Defendants demands under the TPP.

176.    Based on the aforementioned facts and circumstances, justice requires the enforcement of Defendants' promises and representations to Plaintiffs, along with actual damages.

### COUNT SEVEN

### Fraud

177.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in paragraphs 1 to 177 above as if fully set forth herein.

178.    Defendants have regularly and continuously made false representations to Plaintiffs.

     a.  Upon information and belief, from in or about March 2009 through in or about December 2009, Defendants falsely represented to Plaintiffs that Plaintiffs could not be evaluated for any modification or forbearance programs.

     b.  Upon information and belief, in or about January 2010 through February 2010, Defendants falsely represented to Plaintiffs that they could not be evaluated for any modification program.

c. Upon information and belief, in or about March 2010, Defendants falsely represented to Plaintiffs that the Foreclosure Action would be put on hold while Plaintiffs were in their TPP.

179. Defendants representations were false as Defendants knew, or should have known that (1) from on or about April 2009 through January 2010 Plaintiffs were eligible to be screened as possible candidates for a forbearance under UP, (2) that from on or about January 2010 through February 2010 Plaintiffs were eligible to be screened as possible candidates for a modification under HAMP, and (3) that Defendants had not put the Foreclosure Action on hold.

180. Defendants' representations were intentional or reckless. Upon information and belief, Defendants representations were motivated by the fact that it was substantially more profitable for Defendants to keep Plaintiffs in "limbo" as to their permanent modification status.

181. Defendants' representations were material.

182. As Plaintiffs' mortgage holder and mortgage servicer, Defendants knew, or should have known, that Plaintiffs would rely on their representations.

183. Plaintiffs relied on Defendants' misrepresentations by continuing to work with Defendants in good faith and thus foregoing the opportunity to pursue other avenues to save their home from foreclosure.

184. Plaintiffs' reliance on Defendants' misrepresentations were reasonable as Defendants were in exclusive possession of all information and data as to how Plaintiffs' loan was being serviced, how default interest and late fees were being accrued, and Plaintiffs' foreclosure case was being prosecuted.

185.    Plaintiffs' reliance on Defendants' misrepresentations was to their detriment and as a result Plaintiffs suffered monetary damages, psychological distress, as well as the loss of the opportunity to pursue other avenues to prevent their home from being foreclosed.

### COUNT EIGHT

### Negligent Misrepresentation

186.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in paragraphs 1 to 185 above as if fully set forth herein.

187.    Plaintiffs first contacted Defendants in October 2008 notifying Defendants of their financial situation and seeking assistance with their mortgage.  Plaintiffs continued to request help with their mortgage through January 2010.

188.    Defendants knew, or should have known, that they had special expertise and a more sophisticated understanding of servicing mortgage loans and of available loss mitigation options than Plaintiffs.  This is especially true from on or about April 2009 when HAMP became effective.

189.    Defendants knew, or should have known, that Plaintiffs would rely upon Defendants to protect Plaintiffs' interests in attempting to secure a loan modification and prevent Plaintiffs' home from being foreclosed upon.

190.    Throughout the time period between October 2008 and January 2010, Defendants represented to Plaintiffs that there was nothing that Defendants could do to work with Plaintiffs in regards to Plaintiffs mortgage loan.  This is especially true from on or about April 2009 when HAMP became effective.

191.    In addition, from on or about February 2009 until on or about October 2009, Defendants represented to Plaintiffs that if Plaintiffs made payments under the TPP then Plaintiffs would receive a permanent modification.

192.    During that same period, Defendants represented to Plaintiffs that the Foreclosure Action would be put on hold while Plaintiffs were making payments pursuant to the TPP.

193.    During that same period, Defendants repeatedly represented to Plaintiffs that the documentation submitted by Plaintiffs was insufficient, had not been received, or was being reviewed by underwriting.

194.    Defendants representations were false as Defendants knew, or should have known that (1) from on or about April 2009 through January 2010 Plaintiffs were eligible to be screened as possible candidates for a forbearance under UP, (2) that from on or about January 2010 through February 2010 Plaintiffs were eligible to be screened as possible candidates for a modification under HAMP, (3) that Defendants had no intention of modifying Plaintiffs' loan despite Plaintiffs' compliance with all the requirements of the TPP, (4) that Defendants' document demands were in violation of the HAMP Guidelines, (5) that Defendants had not put the Foreclosure Action on hold, and (6) that Plaintiffs' documentation had in fact been received, was sufficient under the HAMP Guidelines, and was not in fact being reviewed by underwriting.

195.    Defendants' representations were intentional, reckless, and/or negligent.

196.    Plaintiffs relied on Defendants' misrepresentations in making payments pursuant to the terms of the TPP for seven months, repeatedly gathering and sending over the

same documentation to Defendants, and forgoing the opportunity to pursue a means of saving their home from foreclosure through alternative methods.

197.    Plaintiffs' reliance on Defendants' misrepresentations were reasonable, as Plaintiffs in fact fulfilled all of Defendants' represented requirements so that Plaintiffs would receive a permanent modification.

198.    Plaintiffs' reliance on Defendants' misrepresentations was to their detriment and Plaintiffs suffered monetary damages, psychological distress, as well as the loss of opportunity to pursue other avenues to prevent their loan from being foreclosed as a result of Plaintiffs reliance.

## COUNT NINE

### Unjust Enrichment

199.    The Plaintiffs' ninth cause of action has been dismissed with prejudice by the February 16, 2012 Order of this Court

## VI – PRAYER FOR RELIEF

200.    Wherefore, Plaintiffs respectfully requests that this Court enter a judgment against Chase Home Finance and JPMorgan Chase as jointly and severally liable, and in favor of Plaintiffs, and grant the following relief:

a.  On Count One - the Plaintiffs' first cause of action has been dismissed with prejudice by the February 16, 2012 Order of this Court;

b.  On Count Two – the Plaintiffs' second cause of action has been dismissed with prejudice by the February 16, 2012 Order of this Court;

c.  On Count Three, award compensatory damages in an amount to be determined at trial, the costs and reasonable attorneys fees of bringing this action, along

with an injunction compelling Defendants to enter into a permanent loan modification with Plaintiffs in an amount not to exceed $1,600.02, withdraw the Foreclosure Action, and permanently enjoin Defendants from bringing a foreclosure action based upon Plaintiffs 2009 default of their mortgage loan;

d.   On Count Four, award compensatory damages in an amount to be determined at trial, the costs and reasonable attorneys fees of bringing this action, along with an injunction compelling Defendants to enter into a permanent loan modification with Plaintiffs in an amount not to exceed $1,600.02, withdraw the Foreclosure Action, and permanently enjoin Defendants from bringing a foreclosure action based upon Plaintiffs 2009 default of their mortgage loan;

e.   On Count Five, in the alternative, award compensatory damages in an amount to be determined at trial, the costs and reasonable attorneys fees of bringing this action, along with an injunction compelling Defendants to enter into a permanent loan modification with Plaintiffs in an amount not to exceed $1,600.02, withdraw the Foreclosure Action, and permanently enjoin Defendants from bringing a foreclosure action based upon Plaintiffs 2009 default of their mortgage loan;

f.   On Count Six, in the alternative, award compensatory damages in an amount to be determined at trial, the costs and reasonable attorneys fees of bringing this action, along with an injunction compelling Defendants to enter into a permanent loan modification with Plaintiffs in an amount not to exceed $1,600.02, withdraw the Foreclosure Action, and permanently enjoin

Defendants from bringing a foreclosure action based upon Plaintiffs 2009 default of their mortgage loan;

g.  On Count Seven, award compensatory damages in an amount to be determined at trial, punitive damages in an amount not less than sixty million dollars ($60,000,000.00), along with costs and reasonable attorneys fees;

h.  On Count Eight, award compensatory damages in an amount to be determined at trial, punitive damages in an amount not less than forty million dollars ($40,000,000.00), along with costs and reasonable attorneys fees;

i.  On Count Nine – the Plaintiff's ninth cause of action has been dismissed with prejudice by the February 16, 2012 Order of this Court;

j.  On counts Three, Four, Five, Six, Seven, and Eight, any further and additional relief that this Court may determine to be just and equitable.

## VII – JURY DEMAND

201.  Plaintiffs hereby demand a trial by jury on all issues triable by jury in this action.

Dated:  Garden City, New York
        February 29, 2012

Respectfully submitted,
LESTER & ASSOCIATES, P.C.

By:  _s/ Timothy William Salter_
Timothy William Salter, Esq.
*Attorneys for Plaintiffs*
600 Old Country Road, Suite 229
Garden City, New York 11530
Tel:    516-357-9191
Fax:    516-357-9281
Email: tsalter@rlesterlaw.com

UNITED STATES DISTRICT COURT                    Index No. _____
EASTERN DISTRICT OF NEW YORK

JOSEPH PICINI, JR. and MICHELE PICINI,

                              Plaintiffs,

        - against -

CHASE HOME FINANCE LLC., and  JPMORGAN CHASE BANK, N.A.,

                              Defendants.

## AMENDED COMPLAINT

### LESTER & ASSOCIATES, P.C.
**Attorney(s) for Plaintiffs**
**600 OLD COUNTRY ROAD**
**SUITE 229**
**GARDEN CITY, NY 11530**
**(516) 357-9191**

To
Attorney(s) for

Service of a copy of the within
                              is hereby
admitted.
Dated,

Attorney(s) for

_____

    Sir: Please take notice
NOTICE OF ENTRY
that the within is a (certified) true copy of a
duly entered in the office of the clerk of the within named court on                    20
NOTICE OF SETTLEMENT
that an order
            of which the within is a true copy will be presented for settlement to the HON.
one of the judges of the within named Court, at              on the          day of          20
at                                                           Dated,